UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.

SECURITIES AND EXCHANGE COMMISSION, )
)
        Plaintiff, )
v. )
)
JOSHUA KONIGSBERG, LOUIS FISCHLER, and )
MEDISYS CORP., )
)
        Defendants. )
_____)

**COMPLAINT**

Plaintiff Securities and Exchange Commission alleges as follows:

**I. INTRODUCTION**

1. From October 2009 through early March 2010, Defendants Joshua Konigsberg and Louis Fischler engaged in fraudulent market manipulation schemes – replete with kickbacks and bribes – involving the securities of four different issuers. During the same time period, Defendant MediSys Corp. engaged in one of the illicit kickback schemes.

2. Konigsberg and Fischler paid illegal kickbacks to a purported employee of a pension fund to purchase restricted shares of two companies – Casino Management of America, Inc. n/k/a Crosslands Energy Corporation and MediSys. They also paid bribes to a purported corrupt broker to induce the purchase of shares of two other companies – Pavilion Energy Resources, Inc. and Xtreme Motorsports International, Inc.

3. In addition to the kickbacks, Casino and MediSys issued shares of stock in the companies, respectively, as compensation to a middleman who introduced them to the purported pension fund employee. Unbeknownst to the Defendants, the corrupt pension fund employee

was a creation of the FBI. The pension fund's purported friend who helped arrange the deals was an undercover FBI agent, and the middleman was a witness cooperating with the FBI.

4. Konigsberg and Fischler attempted to conceal the kickbacks by entering into a sham consulting agreement between a company Fischler controlled and a bogus consulting company purportedly created to receive the kickback.

5. Konigsberg and Fischler created these schemes in an effort to generate the appearance of market interest in these four companies, induce public purchases of their stock, and artificially increase the stocks' trading prices.

6. As a result of the conduct described in this Complaint, the Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. §240.10b-5. Unless restrained and enjoined, they are reasonably likely to continue to violate the securities laws.

7. The Commission respectfully requests that the Court enter: (1) a permanent injunction restraining and enjoining the Defendants from violating the federal securities laws; (2) an order directing the Defendants to pay disgorgement with prejudgment interest; (3) an order directing the Defendants to pay civil money penalties; and (4) an order barring Konigsberg and Fischler from participating in any offering of penny stock.

## II. DEFENDANTS

8. Konigsberg is the president and CEO of MediSys and was also a promoter of the common stock of MediSys, Casino, Pavillion, and Xtreme. He resides in Palm Beach Gardens, Florida.

9. Fischler was a promoter of MediSys, Casino, Pavillion, and Xtreme. He resides in Delray Beach, Florida.

10. MediSys is a Delaware corporation with its principal place of business in Palm Beach Gardens, Florida. It purports to be in the business of providing medical technology solutions to physicians in the internal medicine, family practice and general practice markets. During the relevant time period, its common stock was quoted on the Pink Sheets operated by OTC Markets, Inc. ("Pink Sheets") under the symbol "MDYO." Its securities have never been registered with the Commission.

11. MediSys' stock is a "penny stock" as defined by the Exchange Act. At all times relevant to this Complaint, the stock's shares traded at, or less than, $1 per share. During the same time period, MediSys' stock did not meet any of the exceptions to penny stock classification pursuant to Section 3(a)(51) and Rule 3a51-1 of the Exchange Act. For example, the company's stock: (1) did not trade on a national securities exchange; (2) was not an "NMS stock," as defined in 17 C.F.R. § 242.242.600(b)(47); (3) did not have net tangible assets (i.e., total assets less intangible assets and liabilities) in excess of $5,000,000; and (4) did not have average revenue of at least $6,000,000 for the last three years. *See* Exchange Act, Rule3a51-1(g).

### III.  RELATED ISSUERS

#### A.  Casino Management of America, Inc.

12. Casino was a Nevada corporation with its principal place of business in Lighthouse Point, Florida. The company is now known as Crosslands Energy Corp. and has its principal place of business in Fort Worth, Texas. During the relevant time period, its common stock was quoted on the Pink Sheets under the symbol "CGMA" until November 6, 2009. On

November 6, 2009, its ticker symbol changed to "CRDY." Its securities have never been registered with the Commission.

13. Casino's stock is a "penny stock" as defined by the Exchange Act. At all times relevant to this Complaint, the stock's shares traded at, or less than, $1.00 per share. During the same time period, Casino's stock did not meet any of the exceptions to penny stock classification pursuant to Section 3(a)(51) and Rule 3a51-1 of the Exchange Act. For example, the company's stock: (1) did not trade on a national securities exchange; (2) was not an "NMS stock," as defined in 17 C.F.R. § 242.242.600(b)(47); (3) did not have net tangible assets (i.e., total assets less intangible assets and liabilities) in excess of $5,000,000; and (4) did not have average revenue of at least $6,000,000 for the last three years. *See* Exchange Act, Rule3a51-1(g).

### B. Pavillion Energy Resources, Inc.

14. Pavilion is a Delaware corporation with its principal place of business in Rancho Mirage, California. It purports to be an energy company focused on developing new wind energy capture technology. During the relevant time period, its common stock was quoted on the OTCQB – a new market tier for OTC-traded companies that are registered and reporting with the Commission – under the symbol "PVRE." Its common stock is registered pursuant to Section 12(g) of the Exchange Act. After a four-year gap, Pavilion resumed filing reports in 2010 and currently files periodic reports with the Commission.

15. Pavilion's stock is a "penny stock" as defined by the Exchange Act. At all times relevant to this Complaint, the stock's shares traded at, or less than, nine cents per share.

16. During the same time period, Pavilion's stock did not meet any of the exceptions to penny stock classification pursuant to Section 3(a)(51) and Rule 3a51-1 of the Exchange Act. For example, the company's stock: (1) did not trade on a national securities exchange; (2) was

not an "NMS stock," as defined in 17 C.F.R. § 242.242.600(b)(47); (3) did not have net tangible assets (i.e., total assets less intangible assets and liabilities) in excess of $5,000,000; and (4) did not have average revenue of at least $6,000,000 for the last three years.  *See* Exchange Act, Rule3a51-1(g).

### C.  Xtreme Motorsports International, Inc.

17.     Xtreme is a Nevada corporation with its principal place of business in Henderson, Nevada.  It purports to be in the business of producing, distributing and marketing off-road vehicles of all types.  Its common stock is quoted on the Pink Sheets under the symbol "XTMM."  The Commission temporarily suspended trading in the securities of Xtreme from March 3 through March 16, 2010 because of questions about the accuracy and adequacy of publicly disseminated information concerning trading in the company's stock.  The stock never resumed trading and currently trades in the "gray market."  Its securities have never been registered with the Commission under the Exchange Act.

18.     Xtreme's stock is a "penny stock" as defined by the Exchange Act.  At all times relevant to this Complaint, the stock's shares traded at, or less than, twenty cents per share.

19.     During the same time period, Xtreme's stock did not meet any of the exceptions to penny stock classification pursuant to Section 3(a)(51) and Rule 3a51-1 of the Exchange Act.  For example, the company's stock: (1) did not trade on a national securities exchange; (2) was not an "NMS stock," as defined in 17 C.F.R. § 242.242.600(b)(47); (3) did not have net tangible assets (i.e., total assets less intangible assets and liabilities) in excess of $5,000,000; and (4) did not have average revenue of at least $6,000,000 for the last three years.  *See* Exchange Act, Rule3a51-1(g).

## III.  JURISDICTION AND VENUE

20. The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(d) and 77v(a); and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

21. This Court has personal jurisdiction over the Defendants, and venue is proper in the Southern District of Florida, because Konigsberg and Fischler reside in the District and MediSys' principal place of business is located in the District.  Additionally, many of the Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the District.  For example, Konigsberg and Fischler sent numerous e-mails regarding the scheme to the cooperating witness in the District during the times relevant to the Complaint.

22. The Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of a means or instrumentality of interstate commerce, or of the mails, in connection with the conduct alleged in this Complaint.

## IV.  THE FRAUDULENT SCHEMES

23. Konigsberg and Fischler have worked together as stock promoters for several years and are close friends and business associates.  On October 22, 2009, Konigsberg and Fischler first met in Coral Springs, Florida with the cooperating witness to discuss the possibility of engaging in various stock manipulation schemes.

24. Shortly afterwards, on October 26, 2009, Konigsberg, Fischler, and the cooperating witness met again with the FBI agent, who posed as a contact for the corrupt, fictitious pension fund employee.  Later, through phone calls and emails, they formulated their manipulation schemes.

25. These schemes included two restricted stock transactions involving the securities of Casino and MediSys and two market transactions involving the securities of Pavilion and Xtreme.

### A. The Casino Restricted Stock Transaction and Kickback

26. In October 2009, Konigsberg and Fischler entered into their business arrangement with the cooperating witness and the agent. The parties agreed the pension fund would purchase $20,000 worth of Casino stock in exchange for a 40 percent kickback by Konigsberg and Fischler to the pension fund employee.

27. In addition, Konigsberg and Fischler agreed the cooperating witness, as a middleman, would receive shares of Casino for introducing the parties to the deal.

28. To conceal the kickback, Konigsberg and Fischler agreed they would pay money constituting the kickback to a bogus consulting company, and they arranged to enter into a phony consulting agreement. They understood the bogus consulting company would not be performing any actual consulting services.

29. On October 26, 2009, pursuant to a share purchase and sale agreement between the pension fund and Fischler, the pension fund agreed to purchase approximately 16,000 shares of Casino common stock for $20,000. On that same day, the bogus consulting company entered into a consulting agreement with a company Fischler controlled.

30. The next day, the FBI wired $20,000 to Fischler's bank account. Subsequently, on October 28, 2009, Fischler mailed a check from his company for $8,000 – a kickback of 40 percent of the stock purchase price - to the bogus consulting company. The check contained a notation that the payment was for a "consulting retainer."

31.     On November 6, 2009, Casino issued 16,000 shares of its common stock to the pension fund and 4,000 shares to the cooperating witness.

### B. The MediSys Restricted Stock Transaction and Kickback

32.     In November 2009, Konigsberg and Fischler entered into another scheme with the cooperating witness and agent. They agreed the pension fund would purchase $20,000 of MediSys restricted stock in exchange for a 40 percent kickback by Konigsberg and Fischler to the pension fund employee.

33.     To conceal the kickback, Konigsberg and Fischler agreed again they would pay the money to the same bogus consulting company used in the Casino scheme, relying upon the prior consulting agreement used in the Casino transaction.

34.     In addition, Konigsberg and Fischler agreed the cooperating witness, as a middleman, would receive restricted shares of MediSys for introducing the parties to the deal.

35.     Konigsberg and Fischler acknowledged the illegality of their plan, as evidenced during their October 26, 2009 discussion:

>     Fischler:       "Not that we're doing anything we shouldn't…"
>     Konigsberg:     "Well, [laughter] no, we are."
>     CW:             "We are. . . I like to call a spade a spade."
>     Fischler:       "There's nothing wrong with hiring a consultant as an advisor to a transaction…that's all we are doing."

36.     On November 2, 2009, pursuant to a share purchase and sale agreement between the pension fund and Fischler, the pension fund agreed to purchase approximately 4,000 shares of MediSys common stock for $20,000. That day, the FBI wired $20,000 to Fischler's bank account.

37. Also that same day, Fischler mailed a check from his company for $8,000 – a kickback of 40 percent of the stock purchase price - to the bogus consulting company. The check contained a notation that the payment was for "consulting services."

38. On November 9, 2009, MediSys issued the 4,000 restricted shares of MediSys stock to the pension fund and 1,000 restricted shares of MediSys stock to the cooperating witness.

39. Konigsberg, acting as president of MediSys, executed both stock certificates.

### C. The Pavilion Market Manipulation and Bribe

40. In late October 2009, Konigsberg, Fischler, and the cooperating witness began discussing a potential "pump-and-dump" market manipulation scheme involving Pavilion's common stock, whereby they could falsely generate the appearance of market interest in the stock.

41. Ultimately, Konigsberg agreed to pay a bribe of $5,000 to the cooperating witness's corrupt broker – who, in reality, did not exist - in exchange for the broker's agreement to purchase approximately $500,000 worth of Pavilion stock in the open market in the broker's discretionary customer accounts.

42. Konigsberg agreed the broker would make the purchases over a period of 4 to 5 weeks to artificially inflate the stock price from 6 to 30 cents per share. They also agreed to arrange for timed press releases to be issued as the purported reason for any spikes in volume or price. The fraudulent buying would create the false impression in the market that Pavilion was developing active trading supporting a rising stock value.

43. On November 16, 2009, Konigsberg wired $5,000 to the cooperating witness's account with the understanding the cooperating witness would then forward the money to the broker.

44. On November 18, 2009, the FBI made two purchases of 35,000 shares each of Pavilion stock in the open market for a total cost of $4,919. These two purchases constituted approximately 47 percent of the trading volume in Pavilion for that day.

45. Shortly afterwards, the cooperating witness told Konigsberg the broker was in poor health and could not continue the arrangement. The cooperating witness returned $4,000 to Konigsberg and advised him the broker had kept the balance for the one trade.

### D. The Xtreme Market Manipulation and Bribe

46. On January 25, 2010, Konigsberg spoke by telephone with the cooperating witness to discuss the possibility of manipulating the price and trading volume of Xtreme stock.

47. Konigsberg told the cooperating witness he wanted him to purchase, or find others to purchase, $20,000 worth of Xtreme stock before March 1, 2010.

48. Konigsberg stated he believed this level of buying would increase the stock's share price from 7 cents to 20 cents. Konigsberg also told the cooperating witness that once Xtreme's stock price hit 20 cents, he had others who would "come in" and bring the stock from 20 cents to 40 or 45 cents by the end of March.

49. In addition, Konigsberg told the cooperating witness a shareholder who owned 9 million shares of Xtreme stock was waiting for the stock price to near 40 cents before he would begin selling his shares on the open market.

50. On or about February 1, 2010, Konigsberg and the cooperating witness agreed the broker would purchase $20,000 worth of Xtreme common stock over the course of the two

weeks immediately prior to March 1, 2010. In exchange, the broker would receive a $6,000 bribe; half up front and half at the conclusion of trading.

51.     According to the plan, Konigsberg would direct the cooperating witness as to how many shares of Xtreme stock the broker should purchase on a given day and when to place the trades, so the stock would close at a certain price.

52.     On February 11, 2010, Fischler gave the $3,000 bribe, in cash, to the cooperating witness to forward to the broker.

53.     Between February 16 and 25, 2010, the FBI purchased 79,000 shares of Xtreme common stock for a total purchase price of $9,508. During that period, Xtreme's stock price rose from 7 cents to 18 cents - an increase of 157 percent. The majority of the trading volume was the result of purchases by the FBI posing as the fictitious broker.

54.     Shortly afterwards, Konigsberg told the cooperating witness he had also retained Roaringpennystocks.com to promote Xtreme. Roaringpennystocks.com is a website based out of Coral Springs, Florida that touts stocks to its on-line subscribers.

55.     On February 26 and 28 and March 1, 2, and 3, 2010, Roaringpennystocks.com issued three e-mail blasts to its subscribers regarding Xtreme. In those e-mails, the website introduced Xtreme to prospective investors as its "HUGE New Pick" that "[o]n little news . . . has gained over 142% in the last 10 days."

56.     Roaringpennystocks.com alerted subscribers to "[k]eep your eyes peeled because early entrants could make a killing!" and that "[t]oday [March 1, 2010] the stock is trading below their 10 day average. This could be the calm before the storm as the company prepares to release BREAKING NEWS!"

57.     The e-mail blasts were designed to further artificially inflate Xtreme's stock price in accordance with Konigsberg and Fischler's scheme.

## COUNT I

### Fraud In Violation of Section 17(a)(1) of the Securities Act

58.     The Commission realleges and incorporates paragraphs 1 through 57 of its Complaint.

59.     From October 2009 through early March 2010, the Defendants directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

60.     By reason of the foregoing, the Defendants, directly and indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(l) of the Securities Act, 15 U.S.C. §77q(a).

## COUNT II

### Fraud in Violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act

61.     The Commission realleges and incorporates paragraphs 1 through 57 of its Complaint.

62.     From October 2009 through early March 2010, the Defendants, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities:

> (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the

statements made, in the light of the circumstances under which they were made, not misleading; or

(b) engaged in transactions, practices and courses of business which operated as a fraud or deceit upon purchasers and prospective purchasers of such securities.

63. By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, are reasonably likely to continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3).

## COUNT III

### Fraud in Violation of Section 10(b) and Rule 10b-5 of the Exchange Act

64. The Commission realleges and incorporates paragraphs 1 through 57 of its Complaint.

65. From October 2009 through early March 2010, the Defendants, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly:

(a) employed devices, schemes or artifices to defraud;

(b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

66. By reason of the foregoing, the Defendants directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule l0b-5, 17 C.F.R. § 240.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine, and find that the Defendants have committed the violations of the federal securities laws alleged in this Complaint.

### II.

### Permanent Injunctive Relief

Issue a Permanent Injunction restraining and enjoining the Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act, as indicated above.

### III.

### Disgorgement

Issue an Order directing all Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## IV.

## Penalties

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d); and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3).

## V.

## Penny Stock Bar

Issue an Order barring Konigsberg and Fischler from participating in any offering of penny stock, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d) of the Exchange Act,15 U.S.C. § 78u(d), for the violations alleged in this Complaint.

## VI.

## Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VII.

## Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

December 6, 2010          By:     s/ James M. Carlson

James M. Carlson
Senior Trial Counsel
Florida Bar # A5501534
Telephone: (305) 982-6328
Facsimile: (305) 536-4154
E-mail: CarlsonJa@sec.gov

Michelle I. Bougdanos
Staff Attorney
Florida Bar # 0020731
Direct Dial: (305) 982-6307
E-mail : BougdanosM@sec.gov

Trisha D. Sindler
Senior Counsel
Florida Bar # 0773492
Direct Dial: (305) 982-6352
E-mail : FuchsT@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISISON**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154